UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION

**Case Number: 21-14001-CIV-MARTINEZ-MAYNARD**

YOLANDA WOODS,

      Plaintiff,

v.

CHRISTOPHER REEVE, *et al.*,

      Defendants.

_____/

## <u>ORDER ON MOTIONS FOR SUMMARY JUDGMENT</u>

**THIS CAUSE** comes before the Court on nine motions for summary judgment: Defendant Rick Sarcinello's Motions for Summary Judgment against Plaintiff Andrew Coffee IV (ECF No. 138), Plaintiff Vivian Scott (ECF No. 140), Plaintiff Leslie Lowery (ECF No. 139), and Plaintiff Yolanda Woods (ECF No. 146); Defendants Patrick White and Christopher Reeve's Motions for Summary Judgment against Andrew Coffee IV (ECF No. 133), Vivian Scott (ECF No. 134), Leslie Lowery (ECF No. 160), and Yolanda Woods (ECF No. 150); and Defendant Deryl Loar's Motion for Summary Judgment against Andrew Coffee IV (ECF No. 125). Woods responded to Sarcinello, White, and Reeve's (the "Officers") Motions for Summary Judgment (ECF Nos. 189 & 191), to which the Officers filed replies (ECF No. 197 & 199). Coffee IV also filed a response to Loar's Motion for Summary Judgment (ECF No.180), to which Loar replied (ECF No. 187). None of the other Plaintiffs responded to the pending Motions for Summary Judgment. The Court has reviewed the briefing, the record, and is otherwise fully advised in the premises. After careful consideration, the Court rules as follows.

## I.   **BACKGROUND**[1]

This is a tragic case involving the execution of a search warrant in the early morning hours that turned into a shootout and ended with the death of 21-year-old Alteria Woods, an innocent bystander.  SWAT executed the search warrant from the front, entry door and eastside window of the residence.  After SWAT broke through the eastside window, the shootout began when one of the plaintiffs in this consolidated action, Andrew Coffee IV, started firing out of his bedroom and through the eastside window.  Alteria, asleep in the bed facing the eastside window, got caught in the crossfire.  Alteria's mother, Yolanda Woods, initiated this action, as the personal representative of Alteria, against the officers involved in the shooting.  Vivian Scott, the owner of the residence, Leslie Lowery, Scott's friend who was spending the night at the residence, and Coffee IV, Alteria's boyfriend and the person who first fired his weapon, also filed complaints arising from law enforcement's execution of the search warrant.  Those complaints were consolidated into this action for pretrial purposes.

### A.   **Factual Background**

At around 5:30 a.m. on March 19, 2017, SWAT executed a search warrant in Vero Beach, Florida, at a residence owned by Plaintiff Vivian Scott.  (Plaintiff Yolanda Woods and Defendants Christopher Reeve and Patrick White's Joint Statement of Undisputed Facts ("WRW-JSMF") ¶¶ 1, 3, 14–16, 25, ECF No. 141; Plaintiff Yolanda Woods and Defendant Rick Sarcinello's Joint Statement of Undisputed Facts ("WS-JSMF") ¶¶ 12–13, 20, ECF No. 151; Plaintiffs Coffee IV, Scott, and Lowry and Defendants Reeve, White, and Sarcinello's Joint Statement of Undisputed Facts ("CSL-RWS-JSMF") ¶ 12, ECF No. 130).  The search warrant was based on information

---

[1]     The facts are undisputed unless stated otherwise.  When the facts are in dispute, the Court construes them in the light most favorable to Plaintiffs and draws all inferences in their favor.  *See Troupe v. Sarasota Cnty.*, 419 F.3d 1160, 1165, 1167 (11th Cir. 2005).

collected from a narcotics investigation that targeted Andrew Coffee III (aka "Cheezy"), the father of Plaintiff Andrew Coffee IV. (WRW-JSMF ¶ 14). During the investigation, Officer Christopher Reeve conducted two separate controlled buys of $40 worth of crack cocaine from Coffee III using a confidential informant. (WRW-JSMF ¶ 14; CSL-RWS-JSMF ¶ 10). Both transactions occurred at Coffee III's residence in Vero Beach (the "Vero Beach Residence"). (WRW-JSMF ¶ 14; CSL-RWS-JSMF ¶ 10). The confidential informant advised Reeve that she believed there was at least one firearm in the residence. (White and Reeve Statement of Material Facts ("WR-SMF") ¶ 5, ECF No. 145; Woods Resp. to WR-SMF ¶ 5, ECF No. 190; WS-JSMF ¶ 15; CSL-RWS-JSMF ¶ 13). Based on information collected from the investigation, Reeve submitted an application and sworn affidavit for a search warrant on the Vero Beach Residence, which was signed by a judge the same day. (WRW-JSMF ¶ 15; ECF No. 127-3 at 278–91).

Reeve submitted a request for a SWAT team to execute the search warrant because he considered it to be a high-risk operation. (WRW-JSMF ¶ 19; May 3, 2022, Reeve Dep. ("Reeve Dep." at 81:21–82:11, ECF No. 127-3). SWAT's participation was approved. (WRW-JSMF ¶ 19). The SWAT team's mandate was to secure the residence and its occupants and then to turn over control to the assigned drug unit. (WRW-JSMF ¶ 20). Officer Patrick White, a sergeant at the time, was the team leader of the SWAT operation. (WRW-JSMF ¶ 21; WS-JSMF ¶ 14). Reeve and Sarcinello were part of the SWAT team. (*See* Reeve Dep. at 20:13–21:5; May 11, 2022, Rick Sarcinello Dep. at 25:1–19, ECF No. 127-4).

About thirty minutes before executing the warrant, the SWAT team participated in a team briefing at the Sheriff's Office. (WRW-JSMF ¶ 25; WS-JSMF ¶¶ 15–19). The entry team was assigned to the northeast door of the Vero Beach Residence, which was the primary entry used for narcotics sales. (WRW-JSMF ¶ 39). Detective Robert Ryan, who was part of the entry team, was

tasked with delivering a hand-toss, sight-delivered flashbang on the northeast entry door, if necessary.  (WRW-JSMF ¶¶ 31–32; May 5, 2022, Patrick White Dep. ("White Dep.") at 114:23–115:10, ECF No. 127-6).

Reeve and Sarcinello were assigned to the port team, comprised of just them two.  (WRW-JSMF ¶¶ 33, 38, 48).  On command from White, Reeve was to break the eastside window—closest to the northeast entry door—rake it clear so that Sarcinello would be able to see clearly into the window, and make an assessment on whether anyone was in the room.  (WRW-JSMF ¶¶ 36, 38; WS-JSMF ¶ 24; CSL-RWS-JSMF ¶¶ 28–29, 31; Feb. 10, 2022, Andrew Coffee IV Dep. ("Coffee IV Dep.") at 29:9–30:20, ECF No. 127-1; White Dep. at 112:2–21).  Reeve was in charge of utilizing the rake-and-break tool and deploying a flashbang, while Sarcinello was assigned to be Reeve's cover during the rake-and-break operation.  (WRW-JSMF ¶ 34; WS-JSMF ¶ 24).  The flashbang used by Reeve has a deployment apparatus at the end of the rake-and-break tool.  (WRW-JSMF ¶ 31; WS-JSMF ¶ 25).  Unlike the hand-toss flashbang assigned to Detective Ryan, the flashbang at the end of Reeve's rake-and-break tool is typically deployed at an upward angle toward the ceiling and the flashbang remains on the pole itself when deployed, it does not drop.  (WRW-JSMF ¶ 31).



(ECF No. 127-6 at 217).

At the briefing, Reeve advised the team that Andrew Coffee III, Andrew Coffee IV, and Vivian Scott lived in the Vero Beach Residence, and informed the team about the residents' criminal histories.  (WRW-JSMF ¶ 25; WS-JSMF ¶¶ 15–19).  At the time of the search warrant, a background check revealed that Coffee III had 58 criminal charges and 5 felony convictions. (Coffee III's Rap Sheet, ECF No. 128-4; CSL-RWS-JSMF ¶ 14; WR-SMF ¶ 6; Woods Resp. to WR-SMF ¶ 6).  His arrests include possession of a firearm, discharging of a firearm, grand theft of a firearm, discharging a firearm in public, battery on a law enforcement officer, and resisting arrest with and without violence.  (Coffee III's Rap Sheet, ECF No. 128-4; CSL-RWS-JSMF ¶ 14; WRW-JSMF ¶ 6; Woods Resp. to WR-SMF ¶ 6).  A background check revealed that Coffee IV had 36 criminal charges and 4 felony convictions.  (Coffee IV's Rap Sheet, ECF No. 128-5; CSL-RWS-JSMF pg. 4, ¶ 4).[2]  His arrests include aggravated assault with a weapon, aggravated battery,

---

[2]      Paragraph 4 on page 4 of Coffee IV, Lowry, Scott, Reeve, White, and Sarcinello's Joint Statement of Material Facts appears to be misnumbered.

fleeing and eluding police, battery on a police dog, resisting arrest with and without violence, battery on a police officer, and robbery with a firearm.  (Coffee IV's Rap Sheet, ECF No. 128-5; WRW-JSMF ¶ 7; Woods Resp. to WR-SMF ¶ 7).

In addition, Reeve and White were aware that Andrew Coffee II (Jr.)—Plaintiff Coffee IV's grandfather—had been arrested for shooting an Indian River County Sheriff Deputy during a traffic stop and was in custody when the search warrant on the Residence was to be executed. (Woods Add'l Facts to WR-SMF ("Woods-AF to WR-SMF") ¶¶ 79–81, ECF No. 190; Woods and Reeve Resp. to Woods Add'l Facts (WR-Resp. to Woods-AF") ¶¶ 79–81, ECF No. 198).  Reeve had watched a video of the shooting before executing the search warrant.  (Woods-AF to WR-SMF ¶ 80; WR-Resp. to Woods-AF ¶ 80).  Neither Coffee III nor Coffee IV were involved in that shooting.  (Woods-AF to WR-SMF ¶ 82; WR-Resp. to Woods-AF ¶ 82).  However, about a month before the search warrant, Coffee IV was subject to a traffic stop by Indian River County Sheriff's deputies.  (WR-SMF ¶¶ 8–9; Woods Resp. to WR-SMF ¶¶ 8–9; CSL-RWS-JSMF ¶ 15).  Coffee IV livestreamed the stop.  (WR-SMF ¶ 8; Woods Resp. to WR-SMF ¶ 8).  Reeve watched the recording of the livestream.  (WR-SMF ¶ 8; Woods Resp. to WR-SMF ¶ 8).  Plaintiffs Coffee IV, Lowery, and Scott, and Defendants Reeve, White, and Sarcinello agree that Coffee IV made several statements during the stop about the shooting involving his grandfather—Coffee II—that Reeve perceived as threats.  (CSL-RWS-JSMF ¶¶ 15–16).  Woods disputes that Coffee IV's statements during the stop were threatening.  (WR-SMF ¶ 9; Woods Resp. to WR-SMF ¶ 9).

Now, back to the search warrant.  The SWAT team anticipated that Coffee III, Coffee IV, and Scott could or would be at the Residence.  (WRW-JSMF ¶ 23; WS-JSMF ¶ 15).  Scott lived in the Vero Beach Residence with her son, Coffee III, and her grandson, Coffee IV.  (WRW-JSMF ¶ 16; WS-JSMF ¶ 4).  Alteria Woods was Coffee IV's girlfriend.  (WRW-JSMF ¶ 1).  She did not

live at the Vero Beach Residence, but she would sometimes stay the night there with Coffee IV. (WS-JSMF ¶ 5; Apr. 4, 2022, Vivian Scott Dep. ("Scott Dep.") at 36:5–37:11, ECF No. 127-5). The Officers did not know Alteria was at the Residence when the search warrant was executed. (WS-JSMF ¶ 38; WRW-JSMF ¶ 6; CSL-RWS-JSMF ¶ 5).

The SWAT team executed the search warrant at about 5:30 a.m. (WS-JSMF ¶ 20; WRW-JSMF ¶¶ 2, 24). Reeve and Sarcinello approached their assigned position at the eastside window. (WRW-JSMF ¶ 41). Alteria's Chevy Cruz was parked next to the Residence during the execution of the warrant. (Woods-AF to WR-SMF ¶ 47; WR-Resp. to Woods-AF ¶ 47). Immediately before executing the warrant, Reeve and Sarcinello attempted to look through the eastside window, but it was covered with something, and they could not see inside the room. (WRW-JSMF ¶ 42). Because the window was elevated, Sarcinello placed a small stepladder outside the window so that he could step up and get a better view of the room inside. (WRW-JSMF ¶ 43).

Meanwhile, the entry team went around the corner to their assigned position at the northside door. (WRW-JSMF ¶ 44). Before White could knock and announce, Coffee III opened the door. (WRW-JSMF ¶ 44). White began yelling "Sheriff's Office. Search Warrant." (CSL-RWS-JSMF ¶ 41; *see also* WRW-JSMF ¶ 45; WS-JSMF ¶ 34). After opening the door, Coffee III began to shut the door and go back inside the house. (WRW-JSMF ¶ 46). Lieutenant Dixon grabbed the door handle and pulled it back open. (WRW-JSMF ¶ 46). Coffee III was ordered to stop resisting; he was holding a bag of what was later learned to be cocaine. (WRW-JSMF ¶ 46). White then put his hands on Coffee III and tried to get him to the ground to secure his hands. (WRW-JSMF ¶ 47; White Dep. at 129:17–131:13).

While White was attempting to secure Coffee III, Detective Ryan deployed the hand-toss, sight-delivered flashbang in the open area of the room in front of the bed of what was Coffee III's

bedroom. (WRW-JSMF ¶ 47; ECF No. 128-8 at 1; ECF No. 127-4 at 241; 128-13 at 79). Ryan testified at his deposition that before he detonated the flashbang, he looked inside the bedroom, which was illuminated from the light on the pistols and flashlights held by officers at the scene. (Detective Robert Ryan Dep. ("Ryan Dep.") at 41:3–13, 44:14–15, ECF No. 128-14). Further, Ryan stated that he did not see anyone in the room before he deployed the flashbang. (Ryan Dep. at 43:20–44:9). After Ryan deployed the flashbang, an unidentified female emerged from that room, came to the threshold, and was taken into custody. (WRW-JSMF ¶ 47; CSL-RWS-JSMF ¶ 44; Ryan Dep. at 43:1–20). Ryan testified that she was hidden from sight. (Ryan Dep. at 44:14–15). Alteria was not harmed by the detonation of the hand-tossed flashbang through the entry door. (WRW-JSMF ¶ 9; *see also* Medical Examiner Report of Alteria Woods ("Alteria Med. Rep."), ECF No. 128-9).

On the eastside of the Vero Beach Residence, Reeve and Sarcinello heard commotion from the entry door area and knew the entry team had made contact with someone. (WRW-JSMF ¶¶ 44–45). After securing Coffee III, White got back up on his feet, got on his radio, and ordered the port team to "execute the port." (WRW-JSMF ¶ 48; White Dep. at 133:23–134:24). Upon command, Reeve began the rake-and-break procedure. (WRW-JSMF ¶ 49; Reeve Dep. at 162:23–163:7). Woods disputes that Reeve stated "Sheriff's Office. Search Warrant." before executing the rake-and-break. (WR-SMF ¶ 32; Woods Resp. to WR-SMF ¶ 32; *see also* Coffee IV Dep. at 192:3–17). Reeve did not have a firearm in hand while executing the procedure. (WRW-JSMF ¶ 29; Reeve Dep. at 170:24–171:8). Sarcinello provided cover for Reeve during the procedure by pointing his rifle at the eastside window. (WRW-JSMF ¶ 29). Reeve initiated the procedure by hitting the top-glass window panel with the rake-and-break tool and clearing the glass. (WRW-JSMF ¶ 50; WS-JSMF ¶ 36; CSL-RWS-JSMF ¶ 48). He then hit the bottom-glass panel window,

and cleared out the glass, as well as the curtains or blinds.  (WRW-JSMF ¶ 50).  A large television was blocking the bottom-glass window, so Reeve knocked it over to have a clear line of sight into the room.  (WRW-JSMF ¶ 50).  The television set fell on top of Coffee IV—who had walked towards the window—from the dresser underneath the window.   (Woods-AF to WR-SMF ¶ 56; WR-Resp. to Woods-AF ¶ 56).  When the window was cleared out, Reeve deployed the flashbang inside the room in an upwards manner, in the top-right corner of the window, pointed close towards the ceiling.  (WRW-JSMF ¶ 51).  The flashbang made a "boom" noise and there was a flash of light for a moment.  (WRW-JSMF ¶ 51).  After the flash, the room was pitch dark; Reeve could not see anything inside the bedroom, even though the window had been cleared out.  (WRW-JSMF ¶ 52; Reeve Dep. at 170:18–23).

Then, Defendant Andrew Coffee IV opened fire from inside the bedroom.  (WRW-JSMF ¶¶ 3–4, 53, 55; WS-JSMF ¶¶ 41–43).  Alteria was still on the bed inside the room.  (Woods-AF to WR-SMF ¶ 73; WR-Resp. to Woods-AF ¶ 73).  Reeve and Sarcinello did not know who was shooting at them.  (WRW-JSMF ¶¶ 10–11; *see also* WS-JSMF ¶ 45).  Sarcinello saw round muzzle flashes at close range and believed that the bullets were coming right at him.  (WRW-JSMF ¶ 54; WS-JSMF ¶ 44).  Law enforcement officers are trained to understand that the muzzle flash is a target, and that the person shooting the gun is the target acquisition.  (WRW-JSMF ¶ 56; Reeve Dep. at 40:6–23).  Sarcinello returned fire.  (WRW-JSMF ¶ 54; WS-JSMF ¶¶ 42–43).  Reeve was still holding the rake-and-break tool when the first shots came from inside the bedroom.  (WRW-JSMF ¶ 57).  When the shots started, Reeve threw down the rake-and-break tool and unholstered his pistol.  (WRW-JSMF ¶ 57).  At that point, Reeve believed the firing had stopped for a second, so he leaned over to look inside the window because he thought that maybe the threat had been stopped.  (WRW-JSMF ¶ 58; Reeve Dep. at 186:21–189:2).  During this lull, Sarcinello changed

magazines and called for cover.  (WR-SMF ¶ 43, Woods Resp. to WR-SMF ¶ 43).  Sarcinello knew there was something wrong with his weapon.  (WR-SMF ¶ 43; Woods Resp. to WR-SMF ¶ 43; WS-JSMF ¶ 46).  A subsequent investigation revealed that Sarcinello's rifle had been struck with a projectile fired by Coffee IV from the bedroom.  (WR-SMF ¶ 44; Woods Resp. to WR-SMF ¶ 44).

When Reeve looked through the window, he saw a muzzle flash directed toward him right in front of the window.  (WRW-JSMF ¶ 58).  In response, Reeve ducked his head out of the window and returned fire.  (WRW-JSMF ¶ 58).  Reeve was in fear of his life.  (WRW-JSMF ¶ 58).  Sarcinello also heard more gunshots from inside and saw the muzzle flash.  (WRW-JSMF ¶ 59; Sarcinello Dep. at 151:25–152:4).  He returned fire, too.  (WRW-JSMF ¶ 59).  When the shooting stopped from inside bedroom, both Reeve and Sarcinello stopped returning fire.  (WRW-JSMF ¶ 60; WS-JSMF ¶ 49; Reeve Dep. at 192:12–193:1).

Around this time, White came over to the eastside window from the entry door.  (WRW-JSMF ¶ 61).  White saw Reeve and Sarcinello on their knees under the windowsill.  (WRW-JSMF ¶ 62).  Reeve told White that he and Sarcinello were being shot at from the window.  (WRW-JSMF ¶ 62).  White stepped up on his tip toes in the middle of the window and illuminated the room with his pistol-mounted light.  (WRW-JSMF ¶ 63).  From where he stood behind the windowsill, he saw a small room with a doorway directly in front of him, a wall to his left, and that the room opened up a little to the right.  (WRW-JSMF ¶ 63; White Dep. at 142:23–143:21).  The light illuminated enough for White to see inside the room, but he could not see anybody in the room from the angle where he stood.  (WRW-JSMF ¶ 63; White Dep. at 144:1–7).  Then Coffee IV abruptly and briefly appeared in the doorway from the right side of the room and moved to the left out of the doorframe.  (WRW-JSMF ¶ 64).  A muzzle flash came right at White.  (WRW-JSMF ¶

65).  White ducked, came back up, and fired through the window into Coffee IV's direction. (WRW-JSMF ¶ 65; *see also* WS-JSMF ¶ 50).  No more shots were fired.  (WRW-JSMF ¶ 66).

White then notified the team, "Tango down," which signifies that the assailant has been shot or is down.  (WRW-JSMF ¶ 66).  This assessment was incorrect, however, because moments later Coffee IV exited the house from the dilapidated porch in the southeast corner of the house.  (WRW-JSMF ¶ 67).  Sarcinello verbally ordered Coffee IV to drop to the ground and crawl away from the porch.  (WS-JSMF ¶ 52; Sarcinello Depo. at 159:11–160:8).  Two officers from the perimeter took Coffee IV into custody.  (Sarcinello Dep. at 150:11–160:8).  Then, Plaintiff Vivian Scott exited the house from the porch behind Coffee IV.  (Sarcinello Dep. at 159:11–160:8; Scott Dep. at 53:11–24).  Officers escorted Scott off the porch.  (Sarcinello Dep. at 159:11–160:8; Scott Dep. at 53:11–24).

While Sarcinello was ordering Coffee IV to the ground, another officer approached White near the eastside window and gave White a ballistic shield.  (WRW-JSMF ¶ 68; White Dep. at 151:2–154:10).  White used a stepladder to look inside the eastside bedroom window.  (WRW-JSMF ¶¶ 68-69).  When he looked inside the room, he saw Alteria on the bed and she was not responsive to White's commands.  (WRW-JSMF ¶ 69).  Alteria had been struck ten times in the body with bullets shot by Sarcinello.  (WRW-JSMF ¶¶ 5, 8; WS-JSMF ¶¶ 55–56).  She died from the gunshot wounds.  (WRW-JSMF ¶ 7; WS-JSMF ¶ 56).  Coffee IV was not injured from any of the shots fired.  (WRW-JSMF ¶¶ 5, 8; WS-JSMF ¶ 57).  Ryan and Deputy Kelsey Zorc—another officer at the scene—sustained gunshots by friendly fire from Sarcinello.  (Sarcinello Dep. at 19:3–25; Ryan Dep. at 60:2–61:23).  In total, Reeve fired four rounds, White fired four rounds, Sarcinello fired 16 rounds, and Coffee IV fired four rounds.  (WRW-JSMF ¶ 4).

White notified Ryan over the radio—who was at the front entrance of the Residence—that Coffee IV had exited the Residence. (Ryan Dep. at 50:4–14). In response, Ryan and Jimmy Dixon entered into the north door bedroom of the Residence where Ryan had earlier deployed the hand-toss grenade. (Ryan Dep. at 50:15–22). Ryan and Dixon proceeded down a hallway until they reached an open door on the left. (Ryan Dep. at 51:14–52:7). When they went inside the bedroom they encountered an unresponsive female without a pulse, later identified as Alteria. (Ryan Dep. at 52:5–25). Ryan then exited the bedroom and proceeded to clear the rest of the Residence, moving to the west. (Ryan Dep. at 57:20–58:9). Deputy Christian Mathisen located Plaintiff Leslie Lowery—a friend of Scott's—on the westside of the house and passed her to Ryan, who escorted her to the threshold of the Residence where he handed her to someone outside. (CSL-RWS-JSMF ¶ 89; Mar. 21, 2017, Christian Mathisen Dep. ("Mathisen Dep.") at 29:22–30:4, ECF No. 128-18; Apr. 2, 2022, Leslie Lowery Dep. ("Lowery Dep.") at 38:3–40:8, 53:10–54:18, ECF No. 127-2). Lowery was located in Scott's bedroom, at the furthest point away from where the entry team initiated the search warrant; in other words, at the opposite end of the house. (Mathisen Dep. at 36:13–22; CSL-RWS-JSMF ¶ 81). Neither Scott nor Lowery sustained any physical injuries as a result of the flashbangs or gunfire or from being handcuffed outside the Residence after they exited the Residence. (CSL-RWS-JSMF ¶¶ 87, 90–92).

A few hours after SWAT executed the search warrant at the Residence, Defendant Deryl Loar, Sheriff of Indian River County, held a press conference to address the shooting incident. (Plaintiff Andrew Coffee IV and Defendant Deryl Loar's Joint Statement of Undisputed Facts ("CL-JSMF") ¶¶ 1–2). Dressed in uniform, Loar stated that Coffee IV "cowardly used Ms. Woods as protection." (CL-JSMF ¶¶ 3–4).

### B. **Procedural Background**

Plaintiff Yolanda Woods, as the Personal Representative of Alteria Woods, initiated this civil rights action under 42 U.S.C. § 1983 against the Officers in their individual capacities. (Woods SAC, ECF No. 159). She asserts a claim against each Officer for excessive force in violation of the Fourth and Fourteenth Amendments. (Woods SAC ¶¶ 58–106). The Officers have moved for summary judgment on all claims, arguing that they are entitled to qualified immunity because there was no constitutional violation. (ECF No. 146 at 13–17; ECF No. 150 at 17–21). In addition, Reeve and White argue that the claims against them fail for lack of causation because the only bullets that struck Woods were Sarcinello's. (ECF No. 150 at 21). In response, Woods argues that the Officers are not entitled to qualified immunity, and that Reeve and White can be liable even though their shots did not cause Alteria's death. (ECF No. 189 at 5–16; ECF No. 191 at 6–20).

In three separate actions, Plaintiffs Andrew Coffee IV, Leslie Lowry, and Vivian Scott (the "Consolidated Plaintiffs") filed Complaints against the Officers, individually.[3]  (*See* Coffee IV SAC, ECF No. 152; Lowry SAC, ECF No. 153; Scott SAC, ECF No. 154). Coffee IV also sued Sheriff Deryl Loar in his individual and official capacity. (Coffee IV SAC ¶¶ 269–80). Those actions were consolidated into the above-captioned case for pretrial purposes. (ECF No. 32). Each of the Consolidated Plaintiffs asserts three claims against each of the Officers under § 1983 for

---

[3]      The Consolidated Plaintiffs' Second Amended Complaints name the Indian River County Sheriff's Department (the "Sheriff's Department") as a Defendant. That appears to be a typographical error. The parties stipulated to the dismissal of the Sheriff's Department. (*See* ECF No. 148). In response, the Court struck those Stipulations as procedural improper and required the Consolidated Plaintiffs file Second Amended Complaints removing the Sheriff's Department as a party. (*Id.*). Those operative Complaints do not assert any claims against the Sheriff's Department, although they refer to the Sheriff's Department as a Defendant in text. Because no claims are asserted against the Sheriff's Department, the Court does not consider it to be a party to this action.

negligence, excessive force, and assault and battery.  (*See* Coffee IV SAC ¶¶ 79–268; Lowery SAC ¶¶ 80–272; Scott SAC ¶¶ 79–271).  In addition, Coffee IV asserts a claim for defamation and intentional infliction of emotional distress against Loar.  (Coffee IV SAC ¶¶ 269–80).  The Officers and Loar have moved for summary judgment against the Consolidated Plaintiffs on all claims.  (*See* ECF Nos. 125, 133, 134, 138, 139, 140, 160).  The Consolidated Plaintiffs did not respond to the Officers' motions for summary judgment, despite the Court providing them with an extension of time to do so *several months* after the deadline to respond had passed.  (ECF No. 244).  Coffee IV responded in opposition to Loar's motion for summary judgment.  (ECF No. 180).

## II.    <u>LEGAL STANDARD</u>

Summary judgment is appropriate only if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue is genuine if there is sufficient evidence such that a reasonable jury could return a verdict for either party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Similarly, an issue is material if it may affect the outcome of the suit under governing law.  *Id.* The moving party bears the burden of showing the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  At the summary judgment stage, courts must view the evidence in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Chapman v. Am. Cyanamid Co.*, 861 F.2d 1515, 1518 (11th Cir. 1988).  If the evidence advanced by the nonmoving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

### III.    <u>DISCUSSION</u>

All Plaintiffs in this consolidated action assert civil rights claims under 42 U.S.C. § 1983 based on the Officers' use of force when executing the search warrant.  (*See* Woods SAC ¶¶ 58–81; Coffee IV SAC ¶¶ 86–139; Scott SAC ¶¶ 79–275; Lowery SAC ¶¶ 80–276).  "To obtain relief under 42 U.S.C. § 1983, a plaintiff must meet two elements: (1) the conduct complained of must be committed by a person acting under color of state law; and (2) the conduct must deprive the plaintiff of rights or privileges secured by the Constitution or laws of the United States."  *Walker v. Atlanta Police Dep't Pub. Affairs Unit*, 322 F. App'x. 809, 811 (11th Cir. 2009).  Between all four Complaints, Plaintiffs challenge (1) the Officers' use of the hand-toss flashbang through the northside entrance door; (2) the use of the rake-and-break flashbang through the eastside window into Coffee IV's bedroom; and (3) the shots fired inside Coffee IV's bedroom.  (*See* Woods SAC ¶¶ 58–81; Coffee IV SAC ¶¶ 86–139; Scott SAC ¶¶ 79–275; Lowery SAC ¶¶ 80–276).  Woods only challenges the rake-and-break flashbang and the shots inside Coffee IV's bedroom.  (Woods SAC ¶¶ 58–81).  The Court, in turn, examines whether each use of force was a constitutional violation.  It then considers Coffee IV's state law tort claims against Sheriff Loar based on Loar's statement at the press conference after the search warrant was executed.

### A.    <u>Qualified Immunity</u>

The Officers argue they are entitled to qualified immunity on all Plaintiffs' civil rights claims under 42 U.S.C. § 1983.  (*See* ECF Nos. 133, 134, 138, 139, 140, 146, 150, 160). "Qualified immunity shields 'government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Davis v. Waller*, 44 F.4th 1305, 1312 (11th Cir. 2022) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "In order

to receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)).

If the official was acting within the scope of his discretionary authority, the burden "shifts to the plaintiff to show that qualified immunity is not appropriate." *Id.* "To overcome the defense of qualified immunity, the plaintiff must show first, that the defendant violated a constitutional right and, second, that the right was 'clearly established.'" *Davis*, 44 F.4th at 1312 (quoting *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019)). Because there is no dispute that the Officers were acting within their discretionary functions when they executed the search warrant, the Court only evaluates whether the Officers violated a constitutional right and whether the right was clearly established. *See Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004) (explaining that whether an officer was performing a "discretionary function" focuses on whether the conduct is "of a type that fell within the employee's job responsibilities").

**1. The Constitutional Rights Allegedly Infringed.**

Woods, on behalf of Alteria, asserts a violation of Alteria's right to be free from excessive force under the Fourth and Fourteenth Amendments, while the Consolidated Plaintiffs assert such claims only under the Fourth Amendment. "[T]he Fourth Amendment governs 'a free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person.'" *Corbitt v. Vickers*, 929 F.3d 1304, 1313 (11th Cir. 2019) (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)). "'[T]he Fourteenth Amendment guards against the use of force against arrestees and pretrial detainees.'" *Id.* (quoting *J W ex rel. Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1259 (11th Cir. 2018)).

Applying these principles here, if Plaintiffs were seized before force was used or by way of the force, then the claims must be analyzed under the Fourth Amendment, but if Plaintiffs were not so seized, then the Fourteenth Amendment applies. *See Corbitt*, 929 F.3d at 1313.

At around 5:30 a.m. on March 19, 2017, an armed SWAT team surrounded the Vero Beach Residence and directed their conduct towards controlling and, ultimately, restraining the movement of its occupants. Based on these facts, the Court finds that Plaintiffs were "seized" before or by way of the Officers' force—the flashbangs and shots—inside the Residence because "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *Cal. v. Hodari D.*, 499 U.S. 621, 626 (1991) ("The word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful.").

That some of the Plaintiffs may have been innocent bystanders to the events surrounding the execution of the search warrant does not impact the Court's "seizure" analysis. Indeed, the general principle that "'whenever a police officer accosts an individual and restrains his freedom to walk away, he has seized that person' . . . applies with equal force in cases involving innocent bystanders located at the scene of an active arrest." *Corbitt*, 929 F.3d at 1314 (quoting *Michigan v. Summers*, 452 U.S. 692, 696 n.5 (1981)). Ultimately, "an innocent bystander who is not suspected of any wrongdoing may be seized—in some cases reasonably and in other cases potentially unreasonably—within the meaning of the Fourth Amendment." *Id.*; *see also Summers*, 452 U.S. at 703–04 (concluding that the connection of an occupant to a home that is subject to a search warrant "gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant"). Therefore, the Court must

analyze Plaintiffs' claims under the Fourth Amendment, not the Fourteenth.  *See id.*, 929 F.3d at 1314 n.11; *see also Real v. Perry*, 810 F. App'x 776, 779 (11th Cir. 2020) ("If Real was seized when Officer Perry pointed the gun at him, then the proper analysis of this case is under Fourth Amendment standards.").

### 2.   Whether the Use of Force Against Alteria was Objectively Reasonable

Finding that the Fourth Amendment governs Plaintiffs' claims, the Court next evaluates whether the use of force against Alteria was reasonable.  "Claims of excessive force are analyzed under the Fourth Amendment's 'objective reasonableness' standard, judging the 'reasonableness of a particular use of force . . . from the perspective of a reasonable officer on the scene . . . .'" *Croom v. Balkwill*, 645 F.3d 1240, 1252 (11th Cir. 2011) (quoting *Graham*, 490 U.S. at 395–96). "Generally, such claims require a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Id.* (internal quotation marks omitted).  Stated differently, the Court must "weigh 'the quantum of force employed' against 'the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; and whether the suspect actively resisted arrest or attempted to evade arrest by flight.'"  *Dukes v. Deaton*, 852 F.3d 1035, 1042 (11th Cir. 2017) (quoting *Salvato v. Miley*, 790 F.3d 1286, 1293 (11th Cir. 2015)).  Courts also consider "the need for the use of force, the relationship between the need for force and the amount of force used, and 'the extent of the injury inflicted.'"  *Lucibella v. Town of Ocean Ridge*, No. 22-11056, 2023 U.S. App. LEXIS 8324, at *17 (11th Cir. 2023) (citation omitted).  These factors are not applied mechanically.  *Dukes*, 645 F.3d at 1043.  The Court must evaluate reasonableness from "the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation."  *Graham*, 490 U.S. at 397 (citation omitted).

But before examining the reasonableness of the Officers' use of force, the Court pauses to note the "considerable case law" indicating that no Fourth Amendment violation occurred with respect to Alteria because the governmental action was not intentionally targeted at her. *See Corbitt*, 929 F.3d at 1323. Indeed, U.S. Supreme Court and nonbinding caselaw suggests that "intentional governmental action directed toward the plaintiff, not accidental effects, is required" to sustain a Fourth Amendment violation. *See id.* at 1318 (citing *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596 (1989)). Accordingly, the Court is doubtful Alteria can assert a Fourth Amendment claim as an innocent bystander. To the extent she can, the Court evaluates the reasonableness of the Officers' use of force.

First, the Court considers the reasonableness of the Officers' use of the rake-and-break flashbang inside Coffee IV's bedroom. When Reeve deployed the flashbang, the undisputed facts and circumstances confronting Reeve and Sarcinello were as follows: they were executing a search warrant at a house where illegal narcotics transactions occurred; they could not see inside the eastside-bedroom window because it was dark; they knew the entry team had made contact with someone; they knew that Coffee III and Coffee IV had extensive, violent criminal histories; they knew that there was at least one firearm in the Residence; and they did not know Alteria was at the Residence. Viewing the facts in the light most favorable to Alteria, the Court finds that the use of the flashbang on the rake-and-break pole was reasonable to disorient the occupants in the room given that the Residence had not yet been secured. *Cf. Dukes*, 852 F.3d at 1042–43 (commenting how the third flashbang was gratuitous but that it was possible that the record could support the use of the first two flashbangs, including the rake-and-break detonation to divert the attention of the residence occupants). Notably, there is no evidence that Alteria, Coffee IV, or any other occupant of the Residence was injured by the rake-and-break flashbang. In fact, Coffee IV testified

that he did not believe that a flashbang was deployed inside his bedroom because he was not "all the way blinded" by it, although his ears were ringing.  (Coffee IV Dep. at 152:3–154:2).  While Woods argues that there is an inference Alteria was "affected" by the rake-and-break flashbang because she was laying on the bed turned to the left when she was struck by several gunshots, that is nothing more than speculation.  (*See* ECF No. 191 at 8).  In sum, the use of force was reasonable based on the facts and circumstances confronting the Officers and they did not violate the Fourth Amendment.

Second, the Court decides whether the Officers used excessive force when they fired shots inside the eastside window to Coffee IV's bedroom.  The answer must be no.  The undisputed facts are that after Reeve deployed the rake-and-break flashbang, Coffee IV started shooting towards the window where Reeve and Sarcinello were located.  When Reeve and Sarcinello returned fire, neither knew that Alteria was in the bedroom.  The undisputed facts also show that during a lull in the firing from inside the bedroom, Reeve and Sarcinello stopped firing, and White looked inside the bedroom window.  White did not see anyone in the bedroom and was fired on again from inside the bedroom.  White fired back, and that was the last shot.

Viewing these undisputed facts in the light most favorable to Plaintiffs, the Officers used a reasonable amount of force when returning fire inside the eastside bedroom.  "[I]t is constitutionally permissible for an officer to use deadly force when 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Carr v. Tatangelo*, 338 F.3d 1259, 1268 (11th Cir. 2003) (quoting *Tenn. v. Garner*, 471 U.S. 1, 11 (1985)).  There is no doubt that the Officers had probable cause to believe they faced a threat of serious physical harm from the shots fired by Coffee IV.  Indeed, Sarcinello's own weapon jammed after it sustained a hit from one of Coffee IV's shots—showing just how close Coffee IV's shots

came to Sarcinello's body.  In a rapidly escalating situation involving deadly force, coupled with police response training, the Officers acted in an objectively reasonable manner to the imminent threat they faced by Coffee IV firing shots in their direction.

Further, the Court does not find that a warning before the Officers' use of deadly force was feasible given the necessity for a split-second response to Coffee IV's shots.  *See Davis v. Walker*, 44 F.4th 1305, 1315 (11th Cir. 2022).  Moreover, when there was a lull in the shooting, and White tried to look inside the window, Coffee IV shot again.  There was no time for a warning.  At bottom, no Fourth Amendment violation occurred.  *See L.A. Cnty. v. Rettele*, 550 U.S. 609, 616 (2007) ("When officers execute a valid warrant and act in a reasonable manner to protect themselves from harm . . . the Fourth Amendment is not violated."); *Singletary v. Vargas*, 804 F.3d 1174, 1181 (11th Cir. 2015) ("[I]t is reasonable, and therefore constitutionally permissible, for an officer to use deadly force when he has 'probable cause to believe that his own life is in peril.'" (quoting *Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005)).

Therefore, because the Officers' use of force was objectively reasonable, such force did not violate the Fourth Amendment, and the Officers are entitled to qualified immunity as to Alteria's claims.

### 3.  Whether Alteria's Constitutional Rights Were Clearly Established.

Even if the Court found that the Officers used excessive force against Alteria, it would still find that the Officers are entitled to qualified immunity because their conduct did not violate clearly established law.  "Official conduct violates clearly established law if the 'contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'"  *Dukes*, 852 F.3d at 1043 (alterations adopted) (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 735 (2011)).  A plaintiff can demonstrate that a right was clearly established

in three ways: (1) by producing "a materially similar case" decided by the U.S. Supreme Court, Eleventh Circuit, or the Florida Supreme Court; (2) by pointing to a "broader, clearly established principle that should control the novel facts in [plaintiff's] situation"; or (3) by showing that an "official's conduct was so far beyond the hazy boarder between excessive and acceptable force that the official had to know he was violating the Constitution even without caselaw on point." *Morton v. Kirkwood*, 707 F.3d 1276, 1282 (11th Cir. 2013) (first quoting *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005) (first alteration adopted); then quoting *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000) (alteration adopted)).

The first and second ways a plaintiff can show the law is clearly established is through caselaw. *See Vinyard v. Wilson*, 311 F.3d 1340, 1350–52 (11th Cir. 2002). The second way identifies "some broad statements of principle in case law [that] are not tied to particularized facts and can clearly establish law applicable in the future to different sets of facts." *Id.* at 1351. The first way "look[s] at precedent that is tied to the facts . . . [that] has said that 'Y Conduct' is unconstitutional in 'Z Circumstances.'" *Id.* at 1351–52. With respect to this first way, "a case that is fairly distinguishable from the circumstances facing a government official cannot clearly establish the law for the circumstances facing that government official," but "if the circumstances facing a government official are not fairly distinguishable, that is, are materially similar, the precedent can clearly establish the applicable law." *Id.* at 1352.

Woods, on behalf of Alteria, argues that the law is clearly established that the use of force against Alteria violated the Fourth Amendment in all three ways. *Corbitt* contradicts that proposition. In *Corbitt*, the Eleventh Circuit analyzed whether an officer violated the Fourth Amendment by intentionally firing at a dog but unintentionally shooting a child who was temporarily seized when the yard he was playing in became the scene of an arrest operation. *See*

*Corbitt*, 929 F.3d at 1315, 1318. The Eleventh Circuit concluded that the plaintiff could not show through precedent that the law "clearly established that there is a Fourth Amendment violation when an already-seized bystander . . . is accidentally harmed as an unintended consequence of an officer's intentional shot at something else entirely." *Id.* at 1320. Indeed, as noted earlier, it is far from clear whether this type of accidental conduct can even sustain a Fourth Amendment violation. *See id.* Further, *Corbitt* held that the officer's conduct did not so obviously violate the Fourth Amendment that prior case law is unnecessary to hold the officer liable. *See id.* Following *Corbitt*, this Court finds that the law is not clearly established that there is a Fourth Amendment violation when officers accidentally shoot and kill an innocent bystander in the course of defending themselves from an active shooter. *See id.* at 1320–21 (holding that an accidental shooting does not constitute a clearly establish Fourth Amendment violation under any of three available ways to show clearly established law); *see also Davis v. Waller*, 44 F.4th 1305, 1324 (11th Cir. 2022) (Pryor, J., concurring) ("We largely lack guidance in what constitutes reasonable use of deadly force when hostages or innocent bystanders are caught in the crossfire between the police and a gunman.")

Woods argues that four cases show that it is clearly established that deadly force cannot be used against a suspect that poses no immediate threat to law enforcement or others: *Tennessee v. Garner*, 471 U.S. 1 (1984), *Vaughan v. Cox*, 343 F.3d 1323 (11th Cir. 2003), *Morton v. Kirkwood*, 707 F.3d 1276 (11th Cir. 2013), and *Robinson v. Rankin*, 815 F. App'x 330 (11th Cir. 2020) (unpublished). (ECF No. 191 at 17–18). *Garner* concerned an officer who shot a fleeing suspect who did not appear to be armed; *Vaughan* concerned an officer who shot inside a fleeing, accelerating pickup truck that did not present a threat of serious harm to the officer or others on the road; *Morton* concerned an officer who shot at an individual over whom there was no probable

cause to believe committed a crime and who was in a parked car with his hands raised; and *Robinson* concerned the shooting of an unarmed suspect that was in a car that someone else was trying to use as a weapon but who was not himself reaching for a weapon or presenting a threat to the officers or public. *See Garner*, 471 U.S. at 3–5, 11–12; *Vaughan*, 343 F.3d at 1326–27, 1329–31; *Morton*, 707 F.3d at 1279–80; *Robinson*, 815 F. App'x at 333–34, 341.

These cases are not materially similar because they do not involve an innocent bystander. They also concerned plaintiffs that were visible to law enforcement and who did not present a threat of harm. *Robinson*—albeit, unpublished and not binding[4]—is the most comparable. There, the driver posed a danger to the officers, but the passenger did not. The key difference between that case and this one, though, is that the officers in *Robinson* were aware of and could see the passenger. Here, it is undisputed that the Officers did not know Alteria was in the room with Coffee IV. All they knew was that someone was shooting at them. Moreover, as the Eleventh Circuit noted in *Robinson*, shooting the passenger was not going to stop the driver who was using the car as a weapon. 815 F. App'x at 341–42. Here, returning fire at the person shooting at the officers could subdue the threat of serious bodily injury. The Officers could not have been shooting at Alteria because it is undisputed that they did not know she was in the room. All in all, none of the cases cited help the Court because none are materially similar to the situation here involving an innocent bystander caught in a shootout that was not initiated by law enforcement.

Therefore, in light of *Corbitt*, and because none of Woods' cases show that the law is clearly established that Alteria's rights were violated, the Officers are entitled to qualified immunity.

---

[4]     "[O]nly binding precedent can clearly establish a right for qualified immunity purposes." *Gilmore v. Hodges*, 738 F.3d 266, 279 (11th Cir. 2013).

### B.  Qualified Immunity as to Lowery and Scott

The Officers also move for summary judgment against Plaintiffs Leslie Lowery and Vivian Scott, who were at the Residence when the search warrant was executed.  (ECF Nos. 134, 139, 140, 160).  Neither Lowery nor Scott responded to the motions for summary judgment.  The Officers, Lowery, Scott, and Coffee IV, did, however, submit a Joint Statement of Undisputed Facts, from which the Court will analyze Lowery and Scott's claims.  (ECF No. 130).

To begin, this Court reiterates its doubt that Lowery and Scott can maintain a Fourth Amendment excessive force claim because, as explained above, the challenged use of force was not intentionally directed at them.  To the extent they can sustain such a claim, "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *See Graham*, 490 U.S. at 396.  "In a case involving the execution of an anticipatory search warrant, . . . 'officers [are] authorized to exercise unquestioned command of the situation by placing all the occupants of the Premises on the ground for several minutes while securing the home and ensuring there was no danger to the officers or the public.'"  *Corbitt*, 929 F.3d at 1314 (quoting *Croom*, 645 F.3d at 1253).  Moreover, "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' . . . violates the Fourth Amendment."  *Graham*, 490 U.S. at 396 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

Here, Officers used a reasonable amount of force to attempt to secure the Residence over which they were executing a lawful search warrant.  The search warrant was based on probable cause from the illegal sale of narcotics at the Residence.  The need for the flashbangs was necessary

to assert control over the situation and for officer safety.[5]  The Officers use of their firearms was only in response to Coffee IV opening fire on them.  Importantly, it is undisputed that Lowery and Scott were not injured during the execution of the search warrant.  In sum, the Court finds that the Officers' use of force was objectively reasonable.  Moreover, due to their lack of response to the pending motions for summary judgment, neither Lowery nor Scott have put forth clearly established law showing that the force used against them was unreasonable.  Therefore, the Officers are entitled to qualified immunity on Lowery and Scott's claims.

   **C.  Qualified Immunity as to Coffee IV**

   The Officers argue they are entitled to qualified immunity as to Coffee IV's civil rights claims.  (ECF Nos. 133, 137).  For the same reasons described earlier in this Order regarding the Officers' use of force as to Alteria (Section III(A)(2)), the use of force against Coffee IV was objectively reasonable.  To reiterate, the Officers had probable cause to use deadly force against Coffee IV because Coffee IV was shooting in their direction.  The amount of fire deployed by the Officers was proportional to the threat and there was no time for a warning.  Further, the law is clearly established that the use of force by the Officers was reasonable, *not* unreasonable.  *See Carr*, 338 F.3d at 1268.  The Officers are entitled to qualified immunity on Coffee IV's claims.

---

[5]     Lowery, Scott, and Coffee IV also challenge the use of the initial flashbang through the entry door.  Any challenge to this use of force is a nonstarter because there is no dispute that Detective Ryan deployed the hand-toss flashbang, yet he is not a party to any of the Complaints.  *See Troupe*, 419 F.3d at 1165 ("A § 1983 claim requires proof of an affirmative causal connection between the defendant's acts or omissions and the alleged constitutional deprivation.").  It is also a nonstarter because there is no evidence that any of the Plaintiffs were in the room where the hand-toss flashbang was deployed.  Accordingly, the use of such force against Plaintiffs was *de minimis*, at best.  In any event, there is no evidence contrary to Detective Ryan's testimony that he deployed the hand-tossed flashbang after he confirmed there was no one in the room.  (Ryan Dep. at 43:18–25).  All that to say, the hand-toss flashbang cannot sustain a Fourth Amendment claim.

### D. **Coffee IV's Claims Against the Sheriff**

Separately, Coffee IV asserts defamation and intentional infliction of emotional distress claim under 42 U.S.C. § 1983 against Loar based on Loar's statement at the press conference that Coffee IV "cowardly used Ms. Woods as protection." (Coffee IV SAC ¶¶ 269–80; CL-JSMF ¶ 4). Both claims fail because neither are viable under § 1983. *See Walker v. Atlanta Police Dep't Pub. Affairs Unit*, 322 F. App'x 809, 811 (11th Cir. 2009) ("Although imputing criminal behavior to an individual is generally considered defamation and actionable without proof of special damages, the Supreme Court has held that a claim of being defamed by a police officer is not actionable under § 1983.") (citing *Paul v. Davis*, 424 U.S. 693, 711–12 (1976)); *Rubin v. City of Miami Beach*, 19-cv-20520, 2019 U.S. Dist. LEXIS 237754, at *9 (S.D. Fla. Feb. 12, 2019) ("[A]n intentional infliction of emotional distress claim under Section 1983 is not a viable claim for relief."). Accordingly, Loar is entitled to summary judgment on Coffee IV's claims.

### IV. **CONCLUSION**

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** as follows:

1. The Officers' Motions for Summary Judgment, (ECF Nos. 133, 134, 138, 139, 140, 146, 150, 160), are **GRANTED** as stated herein.

2. Loar's Motion for Summary Judgment, (ECF No. 125), is **GRANTED** as stated herein.

3. The Clerk of Court is **DIRECTED** to **CLOSE** this case and **DENY** all pending motions as **MOOT**.

4.      The Court will enter final judgment by separate order pursuant to Federal Rule of

Civil Procedure 58.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 15th day of May, 2023.

_____
JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
Magistrate Judge Maynard
All Counsel of Record

28